***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Stanback. The appealing parties have shown good grounds to reconsider the evidence and reverse the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties prior to the hearing in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over the parties and the subject matter herein.
2. On January 29, 1996, the parties were bound by and subject to the provisions of the North Carolina Workers' Compensation Act.
3. All parties are correctly designated and there is no question as to misjoinder or non-joinder of parties.
4. On January 29, 1996, plaintiff was employed by defendant-employer and held the position of mason. The employer-employee relationship existed between the parties on that date.
5. Key Risk Management Services, Inc. was the workers' compensation carrier for defendant-employer for all the relevant times herein.
6. The employer admitted plaintiff's right to compensation pursuant to N.C. Gen. Stat. § 97-18(b), and began paying plaintiff temporary total compensation on or about January 30, 1996.
7. Defendants applied to terminate payment of compensation pursuant to N.C. Gen. Stat. § 97-18.1 on April 26, 1996. Following an informal hearing on June 26, 1996, defendants' application was denied by Special Deputy Commissioner Martha W. Lowrance.
8. Defendants reapplied to terminate plaintiff's compensation on July 9, 1996. Following an informal hearing on September 16, 1996, defendants' application was removed from the informal hearing docket and the application was treated as though it were withdrawn.
9. Plaintiff's average weekly wage will be determined by the Industrial Commission.
10. Plaintiff is no longer employed by defendant-employer.
11. On September 6, 1996, plaintiff reached maximum medical improvement for his eye injury.
12. Plantiff seeks no further compensation for damage to plaintiff's teeth.
13. Documents stipulated into evidence include the following:
 Stipulated Exhibit #1: Industrial Commission Forms, Discovery Responses, Various Correspondence, Compensation Records for Plaintiff and a Similarly Situated Employee, and Plaintiff's Medical Records.
14. The issues to be determined by the Full Commission are as follows:
 a) Whether plaintiff is permanently and totally disabled as a result of his admittedly compensable injury by accident?
 b) What was plaintiff's average weekly wage at the time of his injury by accident while in the course and scope of his employment with defendant-employer?
15. The depositions of Dr. John W. Bartlett, Dr. John Frank Warren, and Dr. R. Patrick Yeatts are a part of the evidentiary record in this case.
 ***********
Based upon the evidence of record, the Full Commission adopts in part and modifies in part the Findings of Fact found by the Deputy Commissioner as follows:
 FINDINGS OF FACT
1. Plaintiff was forty-seven (47) years old at the time of the deputy commissioner hearing in this matter. Plaintiff completed high school through a vocational program in Mississippi and obtained certification as a brick mason. Since graduation from high school, plaintiff's work experience has been that of a brick mason, and plaintiff has progressed from being a mason's helper to being designated as a "master mason" as of January 29, 1996.
2. Plaintiff was employed by defendant as a master mason and was performing his job on January 29, 1996, when he was struck in the right eye by a foreign object, causing him to lose his right eye.
3. As a master mason, plaintiff was expected to work at heights, to be able to perform his duties on scaffolding and to work around power tools. Plaintiff's job duties also required him to be able to keep brick or block that he was laying in a straight line both horizontally and vertically. Plaintiff requires the use of two eyes in order to keep the brick or block that he is laying in straight lines as required.
4. Plaintiff was initially treated at the Richmond Eye and Ear Hospital for his eye injury. Thereafter, plaintiff was transferred to Wake Forest University Eye Center where he was treated by Dr. Pearman and Dr. R. Patrick Yeatts and fitted for an artificial eye. Plaintiff was last seen by Wake Forest University Eye Center on or about September 20, 1996.
5. When plaintiff was released from the Wake Forest Eye Care Center, Dr. Yeatts indicated that plaintiff should not return to any type of work that would require him to work at heights or to operate power tools because of the lack of depth perception created as a result of plaintiff losing his right eye. However, plaintiff was cleared to return to work involving activities that a monocular individual could do. Dr. Yeatts found plaintiff to be at maximum medical improvement for his eye injury on September 6, 1996.
6. Throughout the first six months of 1996, defendants' representatives made phone calls to plaintiff and threatened to cut off his benefits unless he returned to employment as a master mason; however, plaintiff was unable to return to his former job as a master mason because it required him to work off scaffolding and around power tools and because it put him in fear of injury to his left eye. The phone calls placed by defendant aggravated plaintiff, made him emotionally upset and distraught, and he would become physically violent after receiving the calls.
7. In April of 1996, defendants filed a Form 24 Application requesting permission to terminate benefits, which was denied. A second Form 24 Application was filed by defendants in July of 1996 and was later withdrawn.
8. On October 24, 1996, plaintiff was hospitalized at the Smith Psychiatric Unit at High Point Regional Hospital because of increasingly bizarre, agitated, and actively psychotic behavior. From the date of the accident through October 24, 1996, plaintiff had become increasingly agitated mentally when confronted with the pressures and fears of returning to his former employment. There is some indication that plaintiff was briefly hospitalized in Atlanta, Georgia, in approximately 1990 for a "nervous condition," but there is no evidence that this event interfered with plaintiff's gainful employment at that time or at any other time up until the injury by accident in this matter.
9. Following the admittedly compensable injury by accident, plaintiff was initially treated for psychiatric problems beginning in October of 1996 by Dr. William Sadowsky. Dr. Sadowsky has diagnosed plaintiff with a "psychiatric disorder not otherwise specified" and "post-traumatic stress disorder." Dr. Sadowsky has opined that plaintiff's eye injury clearly "aggravated, worsened a likely pre-existing psychiatric condition" and that plaintiff has been far more difficult to stabilize since his eye injury. Dr. Sadowsky's final report of July 14, 1997, indicates that plaintiff was not able to return to work in his customary vocation due to plaintiff's fear of losing his other eye.
10. Since 1996, plaintiff has received regular and periodic care and treatment through the Guilford County Area Mental Health Association and continues to be treated through the use of anti-psychotic medications. The current diagnosis for plaintiff by his treating physician, Dr. John W. Bartlett, is that plaintiff suffers from a "chronic paranoid psychosis and paranoid schizophrenia." Dr. Bartlett has indicated that patients such as plaintiff may become severely symptomatic under stress or after injury.
11. Plaintiff is currently medicated through the use of Thorazine and returns to the mental health clinic approximately every ninety (90) days for a renewal of his prescription. Dr. Bartlett notes that Thorazine sedates plaintiff, and while he is able to function on a daily basis, his functioning is at a somewhat slow or dulled pace. Without the medication, however, according to the testimony of plaintiff's son with whom he lives, plaintiff wanders around and may stay awake for up to two or three days.
12. Plaintiff was evaluated by Dr. John F. Warren, a licensed psychologist, at the request of defendants in February of 1998. Dr. Warren has agreed that plaintiff suffers from a serious mental illness, namely schizophrenia, paranoid type. Dr. Warren agrees that plaintiff's eye injury and the stress related to that eye injury probably aggravated or exacerbated plaintiff's mental illness. Dr. Warren opined that plaintiff would probably not be able to continue employment as a brick mason.
13. Dr. Warren further indicated that plaintiff has poor coping mechanisms and is not able to cope with fear or stress like a person who is not suffering from mental illness. Dr. Warren testified in his deposition that plaintiff would have more trouble than most persons maintaining any type of regular employment.
14. Prior to his eye injury in January of 1996, plaintiff was continuously gainfully employed as a brick mason. Plaintiff has not engaged in any gainful employment since the date of his injury by accident in January of 1996, nor has he earned any wages from any gainful employment since his injury in January of 1996.
15. Plaintiff has no education beyond high school and has no skills or work experience other than as a brick mason. Defendants presented no evidence of any suitable jobs that are available to plaintiff or that have been offered to plaintiff other than his job with defendants. Defendants presented no evidence of any other jobs that have been made available to plaintiff or that are available to plaintiff in the workforce, considering his work restrictions and current medical condition. Numerous attempts have been made by defendants to provide plaintiff with vocational rehabilitation and to explore the option of alternative employment, however their efforts have been unsuccessful.
16. Plaintiff testified at the deputy commissioner hearing that he could probably do apprenticeship or laborer type duties related to brick masonry, but that he did not want to be demoted from his ranking as a master mason. Plaintiff has not sought any type of employment since his injury by accident, nor has he participated in vocational rehabilitation efforts of which defendants have attempted to put into place. Finally, Dr. Warren expressed that plaintiff's poor motivation to return to work centered around plaintiff's concerns of decreased earning potential and his fear of re-injury, as opposed to his psychiatric illness.
17. Plaintiff reached maximum medical improvement with respect to his psychiatric condition as of January 29, 1998. Plaintiff's condition was stable at that time, and he was cleared to participate in vocational rehabilitation activities. Plaintiff has not participated in any such activities.
18. From the date of his injury by accident up until January 29, 1998, plaintiff was unable to earn wages in any capacity, initially due to the loss of his right eye, and subsequently due to the aggravation and exacerbation of his pre-existing mental illness.
19. Defendant paid plaintiff temporary total disability compensation from the time of the injury through February 11, 2000, at the rate of $440.02 per week. Defendant has paid plaintiff temporary total disability compensation from February 11, 2000, through the date of filing of the Deputy Commissioner's Opinion and Award, April 24, 2001, at the rate of $339.32 per week pursuant to an amended Form 60 filed by the defendants on or about February 11, 2000.
20. Plaintiff began working for defendant in October of 1995 and was injured in January of 1996; thus, plaintiff worked for defendant for less than fifty-two (52) weeks. In determining plaintiff's average weekly wage, it would not be fair and just to both parties to divide plaintiff's wages earned prior to his injury by accident on January 29, 1996 by twelve weeks. Plaintiff expected to work a forty (40) hour week when hired by defendant; however, plaintiff's failure to work forty (40) hour weeks during the period of his employment with defendant was due to Thanksgiving and Christmas holidays and inclement weather and was due to no fault of his own. A similarly situated employee of the same grade and character in plaintiff's position with defendant working forty (40) hours per week would have earned an average weekly wage of $588.13 per week. This method of average weekly wage computation most nearly approximates what plaintiff would have earned but for his injury by accident and results obtained by determining the average weekly wage of a similarly situated employee is fair and just to both parties. Consequently, plaintiff's average weekly wage is $588.13 per week and his commiserate disability compensation rate is $392.11 per week.
 ***********
Based upon the Findings of Fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On January 29, 1996, plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of his employment with defendant resulting in the loss of his right eye and an aggravation and/or exacerbation of his pre-existing mental illness. N.C.G.S. §97-2(6).
2. As a result of his injury by accident of January 29, 1996, plaintiff was unable to earn any wages in any employment and was temporarily and totally disabled until he reached maximum medical improvement on January 29, 1998. N.C.G.S. § 97-29.
3. Considering results fair and just to both parties, the appropriate method of computing plaintiff's average weekly wage is by determining the wages of a similarly situated employee which yields an average weekly wage of $588.13 and disability compensation rate of $392.11 per week. N.C.G.S. § 97-2(5).
4. Upon reaching maximum medical improvement, plaintiff was no longer entitled to a continuing presumption of total disability, and therefore had the burden of proving permanent disability. By the greater weight of the evidence presented, plaintiff has failed to prove that he is permanently and totally disabled and therefore is not entitled to permanent and total disability. N.C.G.S. § 97-29.
5. Based upon the most competent and credible evidence presented, plaintiff is entitled to continuing total disability compensation at the rate of $392.11 per week beginning January 29, 1996, until further Order of the Commission. Defendants are entitled to a credit for the overpayment of benefits previously paid to plaintiff at the higher compensation rate of $440.02 from the date of injury to February 11, 2000. N.C.G.S. § 97-29.
6. As a result of his admittedly compensable injury by accident on January 29, 1996, plaintiff is entitled to have defendants pay for all medical expenses incurred as a result of that injury, including expenses related to the treatment for his aggravated and exacerbated mental illness, for so long as said treatment is necessary to effect a cure or provide relief of plaintiff's symptoms. N.C.G.S. § 97-25.
7. As a result of his admittedly compensable injury by accident on January 29, 1996, plaintiff is entitled to have defendants pay for vocational rehabilitation. Plaintiff would benefit from vocational rehabilitation; however, plaintiff has been uncooperative with vocational rehabilitation efforts provided by defendants. N.C.G.S. § 97-25.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay plaintiff continuing total disability compensation at the rate of $392.11 per week beginning January 29, 1996, and continuing until further Order of the Commission. Said payment that has accrued shall be paid to plaintiff in one lump sum subject to attorney's fees approved below less a credit for amounts already paid and a credit for overpayment of benefits previously paid to plaintiff at the higher compensation rate of $440.02 from the date of injury to February 11, 2000.
2. Defendants shall pay for all medical expenses incurred by plaintiff as a result of his January 29, 1996, injury by accident and including any medical expenses for the treatment of his mental disease that was aggravated and exacerbated by the injury by accident. Payments shall be made when bills for the same have been submitted to the Industrial Commission for approval.
3. Defendants shall pay for all vocational rehabilitation expenses incurred by plaintiff as a result of his January 29, 1996 injury by accident. Plaintiff is ORDERED to comply with vocational rehabilitation efforts. In the event that plaintiff continues to refuse to cooperate with vocational rehabilitation, defendants may file a Form 24 Application to Terminate or Suspend Payment of Compensation pursuant to N.C.G.S. § 97-18.1.
4. A reasonable attorney's fee of twenty-five (25%) percent of the compensation awarded to plaintiff is approved for plaintiff's counsel. This fee shall be deducted from the amount due plaintiff and paid directly to plaintiff's counsel.
5. Defendants shall pay the costs due this Commission.
This the ___ day of February 2002.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/______________ RENE C. RIGGSBEE COMMISSIONER